**LONG ISLAND LIGHTING COMPANY, Plaintiff,**

v.

**STONE & WEBSTER ENGINEERING CORPORATION, Defendant.**

No. CV 91–2894.

United States District Court, E.D. New York.

Dec. 13, 1993.

Shea & Gould by Michael Lesch, New York City, Kirkland & Ellis by James C. Munson, Chicago, IL, Robert J. Grey, Gen. Counsel by Mindy S. Novick, Asst. Gen. Counsel, Long Island Lighting Co., Hicksville, NY, for Long Island Lighting Co.

Mudge, Rose, Guthrie, Alexander & Ferdon by Laurence V. Senn, Harold G. Levinson and Judith A. Lockhart, New York City, for defendant.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Long Island Lighting Company ("LILCO"), plaintiff in the above-referenced action, brought suit against Stone & Webster Engineering Corporation ("SWEC") for breach of contract, negligence, professional malpractice, and gross negligence in connection with SWEC's work as the Architect–Engineer and as the Construction Manager and Constructor of the Shoreham Nuclear Power Station ("Shoreham"). Presently before the Court is SWEC's renewed motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. · For the reasons stated below, defendant's motion is granted.

## I. BACKGROUND

This action continues a long line of litigation stemming from the failure of Shoreham. In 1967, LILCO entered into a written agreement with SWEC, in which SWEC was obligated to provide engineering, design, management and supervisory services on all phases of the Shoreham project. In 1973, the contract was amended and SWEC was made the Constructor of the project instead of the Construction Manager. At the same time, the amendment added language limiting SWEC's liability under the contract. Section VII.E.1 states:

SWEC's liability irrespective of fault or negligence for the loss or damage to LILCO's property including the plant, or to any third party for personal injury or death and property damage, occurring during construction or thereafter and arising out of SWEC's performance of its services under the Agreement shall be limited at contract or at law to the proceeds from the insurance placed by SWEC and LILCO.... Upon completion of construction of the Project, LILCO agrees to, and does hereby release Stone & Webster, its employees, agents, contractors and subcontractors from any liability, whether or not caused by negligence, for loss or damage to LILCO's property including the plant....

Section VII.E.3 states:

Neither SWEC nor vendors, contractors or subcontractors shall be liable to LILCO, either individually or jointly and irrespective of whether caused by negligence, for loss of anticipated profits, interest, loss by reason of shutdown or nonoperation of the Project or other facilities, or special or consequential loss or damage, arising from any cause whatsoever....

In *Long Island Lighting Co. v. Imo Indus., Inc.*, 6 F.3d 876 (2d Cir.1993), the Second Circuit was called upon to rule on the consequences of this contract language.

LILCO had entered into a contract with Imo Industries for the design and manufacture of three diesel generators for use in the Shoreham plant. LILCO claimed that the generators were defective and brought suit against IMO Industries for breach of contract, breach of warranty, fraud, negligence, strict products liability and RICO violations. LILCO also sued SWEC in its capacity as construction manager, engineer and designer, in tort for negligent supervision of the project and for breach of contract for failing to provide various professional services "consistent with the best engineering and architectural services."

LILCO sought damages from SWEC for all injuries it claimed to have suffered as a result of the diesel problems. These damages included: (1) the price of the diesels; (2) the cost of investigating the diesel problems; (3) the cost of repair and testing; (4) increased licensing costs; (5) the cost of replacing the defective diesels with alternate power generators; and (6) the cost of future testing and monitoring to insure reliable operations of the diesels. LILCO also sought to amend its complaint to allege the following types of damages against SWEC: (1) the increased costs of construction of Shoreham allegedly caused by the diesel problems; and (2) the cost of defending an action before the Public Service Commission ("PSC") and the "penalties" assessed against LILCO by the PSC as a result of the diesel problems.

SWEC successfully moved to dismiss the claims against it in the district court on the ground that the contract language found in the amendment barred LILCO's suit. The Second Circuit summarily affirmed the district court stating only that they had

> reviewed LILCO's claims against SWEC, and conclude that they were properly dismissed in view of the unambiguous language in the parties' contract. Accordingly, we affirm the dismissal of LILCO's claims for substantially the reasons stated by the district court in *LILCO III*, 668 F.Supp. at 242–44.

SWEC argued in the *Imo* case that clauses VII.E.1 and VII.E.3 operated to shift the risk of loss to LILCO. LILCO, on the other hand, contended that it sought only direct economic damages from SWEC and therefore neither section was applicable. According to LILCO, section VII.E.1 was inapplicable because that section applies only to injury to property and persons. LILCO argued that there is a distinction between the economic damages it was suing for and the property damage referred to in VII.E.1.[1] Moreover, LILCO also argued that VII.E.3 only limits SWEC's liability for consequential damages, not for the direct economic damage it was seeking.

The district court disagreed with LILCO and dismissed all of LILCO's claims against SWEC. *Long Island Lighting Co. v. Imo–Delaval Inc.*, 668 F.Supp. 237, 244 (S.D.N.Y. 1987) (Goettel, J.). Although the district court found that the bulk of LILCO's claims were for economic damages, it recognized that at least some of LILCO's claims were for property damage. Thus, the court stated that, "Lilco's remedy for any claims for property damage, i.e., damage to the diesels themselves, whether caused by negligence, malpractice or otherwise, is limited to the insurance placed by it and SWEC." *Id.* Accordingly, to the extent that LILCO was attempting to recover for damage to the diesels themselves, the court held that VII.E.1 barred such recovery. The district court therefore implicitly rejected the distinction LILCO sought to draw between the property damage referred to in VII.E.1 and the direct economic damages it was claiming.

Moreover, the district court went on to hold that "the essence of [LILCO's] claims [were] for economic injury.... [and] clause VII.E.3 specifically *exempts* Stone & Webster from liability for a variety of economic losses in connection with Shoreham's operation or nonoperation. This exemption is for financial loss from any cause whatsoever, and encompasses all economic damages alleged in the amended complaint." *Id.* Again, the

---

1. LILCO informed this Court that "[t]here is simply no room for debate that property damages, such as the destruction of a building by fire, are distinct from economic damages, such as the cost of redesigning and repairing a building that was badly designed and constructed in the first place." LILCO Opp. Brief at 4.

court rejected LILCO's argument that the type of economic damages it was seeking was somehow not encompassed by VII.E.3.

## II. *DISCUSSION*

A. *The Doctrine of Collateral Estoppel Prevents LILCO From Relitigating Whether the Contract Bars Recovery for the Damages it Seeks in this Litigation*

■ The doctrine of collateral estoppel, or issue preclusion, prevents relitigation of an issue which is identical to one necessarily decided in a prior action and which the parties were afforded a full and fair opportunity to litigate. *Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir.1986). At issue in this case, is whether LILCO is seeking the same types of damages here as it sought in *Imo.*

At oral argument and in its papers to the Court, LILCO strenuously argues that collateral estoppel should not apply because in *Imo,* LILCO only sought damages relating to "losses in connection with Shoreham's operation or nonoperation," whereas no such damages are claimed in the case at bar. Accordingly, LILCO suggests that the *Imo* case did not necessarily decide whether the contract language at issue bars the types of damages LILCO now seeks from SWEC.

A review of the types of damages sought by LILCO against SWEC in *Imo* and the types of damages sought against SWEC in this case belies LILCO's position. In *Imo,* LILCO sued SWEC for breach of contract, breach of warranty, professional malpractice and negligence. In the case at bar, LILCO is suing SWEC for breach of contract, professional malpractice, negligence and gross negligence. Additionally, in *Imo,* LILCO alleged the following damages: (1) the purchase price of the diesel generators; (2) the cost of investigating the diesel problems; (3) the cost of repairing and testing; (4) increased licensing costs; (5) increased costs of construction of Shoreham caused by the delays resulting from the diesel problems; (6) costs of replacing the defective diesels with alternative power generators; (7) costs of defending an action before the PSC and penalties assessed against LILCO as a result of the diesel problems; and (8) costs of future testing and monitoring of the diesel generators.

In the present case, LILCO alleges the following damages: (1) the cost of redesign and reconstruction of systems and components; (2) the cost of excessive labor and material charges; (3) additional overhead charges resulting from redesign, reconstruction and excess labor charges; (4) the cost of financing these LILCO expenditures; and (5) additional financing costs incurred by LILCO resulting from delays. Unlike LILCO, this Court cannot discern any meaningful distinction between the types of damages it alleged in *Imo* and the types of damages it now alleges against SWEC.[2]

In *Imo,* LILCO alleged that SWEC misdesigned diesel generators and sought as damages the cost to repair that equipment together with increased construction and delay costs. In this case, LILCO alleges that SWEC misdesigned other systems and components and seeks as damages the repair costs together with increased construction and delay costs. Thus, this Court comes to the inescapable conclusion that collateral estoppel does apply to this case and LILCO cannot relitigate whether the contract language at issue bars the damages it seeks. Accordingly, the claims for damages that LILCO now asserts against SWEC must be dismissed

B. *The 1973 Amendment Applies to Damages Incurred Prior to 1973*

■ LILCO argues that even if this Court finds that collateral estoppel applies, it should not dismiss those claims for damages that arose prior to 1973. In 1973, the parties amended the contract to add the risk allocation language ruled on by the *Imo* court. The amendment, however, was not signed until 1975. Although signed in 1975, the amendment contains language indicating that

**2.** It should also be noted that LILCO used the same arguments to avoid dismissal in the *Imo* case as it does in this case. As in *Imo,* LILCO now argues that the contract language does not apply because LILCO seeks recovery for direct economic damage as opposed to property damage or consequential or special damages.

it is "effective as of May 1, 1973." LILCO maintains that this language means that the limitation of liability found in the amendment only applies to breaches by SWEC that occurred after May 1, 1973.[3]

There is nothing in the relevant provisions to support LILCO's position. To the contrary, the provisions contain no language imposing such a temporal limitation. VII.E.1 clearly and unambiguously states that "SWEC's liability ... for personal injury ... and property damage ... arising out of SWEC's performance of services under the Agreement shall be limited ... to proceeds of insurance." There is no language limiting this clause to SWEC's services after May 1, 1973. Likewise, VII.E.3 contains no language limiting this provision to damages caused after May 1, 1973. Had the parties intended such a temporal limitation to apply, they could have said so. They did not. This court will not read into these provisions a time limitation that is not there. *See Collard v. Incorporated Village of Flower Hill,* 52 N.Y.2d 594, 439 N.Y.S.2d 326, 331, 421 N.E.2d 818, 823 (Ct.App.1981) (where the language chosen by the parties contains no inherent ambiguity, courts will not, under the guise of judicial construction, imply additional requirements to relieve a party from a disadvantage resulting from the express terms of the contract).

The effective date language that LILCO relies on had its genesis in the fact that the amendment was negotiated in 1973[4], but was not executed until 1975. LILCO cannot now transform the plain meaning of this language to create an ambiguity where none exists. This Court therefore finds, as a matter of law, that the risk allocation language found in the 1973 amendment applies to all dam-

ages alleged herein, no matter when they arose.

### C. Under New York Law, LILCO Cannot Maintain a Claim for Gross Negligence Where the Damages it Seeks are Economic in Nature

■ Finally, LILCO argues, that at the least, its claims against SWEC stemming from its allegations of gross negligence must survive, because New York law does not allow parties to contract away claims of gross negligence. *See Gross v. Sweet,* 49 N.Y.2d 102, 424 N.Y.S.2d 365, 367, 400 N.E.2d 306, 308 (Ct.App.1979); *but see Calvin Klein, Ltd. v. Trylon Trucking Corp.,* 892 F.2d 191, 195 (2d Cir.1989) (Under New York law, "[c]arriers can contract with their shipping customers on the amount of liability each party will bear for the loss of a shipment, regardless of the degree of carrier negligence."). However, even if LILCO is correct, its claims must still be dismissed because New York does not allow a party to transform a breach of contract action into a tort action.

LILCO cannot avoid the clear and unambiguous contractual limitations of liability simply by casting it contract claims in tort garb. As the Second Circuit has definitively held, New York law does not recognize a tort cause of action when only economic loss is sought. *County of Suffolk v. Long Island Lighting Co.,* 728 F.2d 52, 63 (2d Cir.1984); *see also Carmania Corp. v. Hambrecht Terrell Int'l,* 705 F.Supp. 936, 938–39 (S.D.N.Y. 1989) (buyer under contract for architectural services could only recover in contract where only economic loss alleged); *Bellevue South Assoc. v. HRH Constr. Corp.,* 78 N.Y.2d 282, 574 N.Y.S.2d 165, 170, 579 N.E.2d 195, 200 (Ct.App.1991).[5] Moreover, this rule applies

---

3. In *Imo,* the court did not need to decide whether the risk allocation provisions applied to damages that arose prior to 1973.

4. The introduction to the amendment makes clear that the amendment was negotiated and agreed upon in 1973. The introduction states: "This agreement, made on the 1st day of May, 1973...." Thus, it is plain that the effective date language was only inserted into the amendment to clarify that SWEC's new position as Constructor and the concomitant modification of the payment schedule became operative in 1973, not 1975.

5. LILCO attempts to save its gross negligence claim by asserting that New York law "allows a plaintiff to bring either tort or contract claims to recover damages for economic loss when the underlying contract is for provision of professional services." LILCO Opp. Brief at 27–28. In making its argument, LILCO ignores the holdings of two recent cases squarely on point—*Carmania Corp. v. Hambrecht Terrell Int'l,* 705 F.Supp. 936 (S.D.N.Y.1989), and *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.,* 725 F.Supp. 656 (N.D.N.Y.1989)—in favor of outdated law.

regardless of whether the claim is couched in terms of negligence or gross negligence. *See Clark–Fitzpatrick, Inc. v. Long Island R.R.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 657, 516 N.E.2d 190, 194 (Ct.App.1987) (gross negligence claim dismissed where only economic damages claimed). Since LILCO has characterized all of its damages as economic, its gross negligence claim must therefore fail as a matter of law.

LILCO's argument that New York recognizes tort causes of action where the defendant owes a duty of care independent of the contract misses the point. If LILCO had alleged tort-like injuries, instead of economic damages, SWEC's status as architect/engineer, with its independent duty of care imposed by law, would have allowed for a tort recovery, regardless of the fact that a contract exists between LILCO and SWEC. But LILCO did not and apparently cannot allege the type of injury necessary to support a tort recovery. Accordingly, LILCO's gross negligence claim must be dismissed.

### III. *CONCLUSION*

For the above-stated reasons, defendant's renewed motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is hereby granted. The Clerk of the Court is directed to close the above-referenced case.

SO ORDERED.

LILCO relies on *Consolidated Edison Co. v. Westinghouse Elec. Corp.,* 567 F.Supp. 358 (S.D.N.Y.1983), even though the courts in both *Carmania* and *Niagara Mohawk* expressly questioned its validity. For example, the court in *Niagara Mohawk* stated, "[t]he holding of *Consolidated Edison* with respect to economic loss is in direct conflict with more recent decisions which hold that New York law does not recognize a negligence cause of action when economic loss alone is involved." 725 F.Supp. at 665.